### STATE, ex rel. WEIR v. BETHESDA MEMORIAL HOSPITAL.
No. 62-L-105.

Circuit Court, Palm Beach County.

October 22, 1962.

Farish & Farish, West Palm Beach, for petitioner.

McMillan & Newitt, Delray Beach, for defendants.

JAMES R. KNOTT, Circuit Judge.

Petitioner seeks to require the commissioners of the Southeastern Palm Beach County Hospital District to admit him to the privilege of practicing medicine in Bethesda Memorial Hospital, alleging that he has been a duly licensed practicing doctor of medicine in Florida since December 4, 1959, that he has the necessary training, experience, judgment and ability, moral character, professional integrity and competence to entitle him to membership on the medical staff of said hospital, and that his application for hospital privileges was rejected without legal or valid reason, because of unlawful, arbitrary and capricious discrimination.

The defendant hospital district was organized under ch. 29387, Special Acts, Laws of Florida, 1953, section 30 of which reads as follows —

"Realizing that factors other than professional must enter into the qualification of those who practice medicine and surgery, the board of commissioners of said Southeastern Palm Beach County Hospital District are hereby authorized and empowered to set up rules, regulations and by-laws for the operation of the hospital, and the hospital staff; the board of commissioners are authorized to give, grant or revoke licenses and privileges of staff members so that the welfare and health of patients and the best interests of the hospital may at all times be best served . . . "

Article III, section 1 of the by-laws, rules and regulations adopted pursuant to the statutory authority cited above includes the following provisions relating to membership on the medical staff of the hospital —

"A license to practice medicine or dentistry shall not alone be sufficient qualification for membership. Membership and privileges shall be extended only to qualified physicians or dentists according to training, experience, judgment, ability, moral character, integrity and competence as evaluated by the credentials committee and recommended to the medical staff and then to the governing board."

The issue presented relates to whether the hospital officials abused their authority, i.e., were guilty of unlawful and arbitrary discrimination against petitioner in denying him hospital privileges without valid reason.

The chairman of the credentials committee of Bethesda Memorial Hospital, Dr. Fred S. Huntington, testified that the action of his committee in rejecting petitioner's application was based

upon a finding that he lacked proper training, integrity and moral character.

Petitioner has had difficulties in his academic and professional career, a large part of which have stemmed from being unable to get along with others. He conceded having "squabbles" with his associates as an intern and many of what he chose to term "intellectual level" differences with his instructors while an undergraduate student at Johns Hopkins University and later as a medical student at the University of Miami School of Medicine, where his reputation among his fellow students was "very poor," according to Dr. John J. Farrell, clinical professor of surgery there. Petitioner received his medical degree after repeating his 4th year. Dr. Farrell, somewhat of a controversial figure in his own right, testified that he advised the credentials committee of Bethesda Memorial Hospital that petitioner was not qualified as a surgeon and suggested "extreme caution" in admitting him to staff membership. He further stated that the placement committee of the school of medicine could not recommend him for an internship, and that he, Farrell, had recommended against granting petitioner a medical diploma. The testimony was in conflict as to whether petitioner's work as a laboratory technician while a medical student was well or poorly done.

Phases of petitioner's qualifications were treated by various witnesses whose testimony ranged from describing habits which might be regarded as mere personal eccentricities, such as scratching his private parts in the presence of female patients, keeping paperback sex books, alcoholic beverages and a profusion of guns in his office, to other matters which reflected gravely upon his moral character and professional ability, or sense of responsibility, including at least one bizarre professional custom which will be referred to later. Since being licensed to practice medicine, petitioner was arrested for driving while intoxicated and forfeited a bond of some three hundred dollars for failure to appear in court.

Dr. Curtis Johnson and Dr. Paul S. Born, who testified for petitioner, stated that certain patients referred to them by petitioner appeared to have received satisfactory treatment at his hands. However, on cross examination, each of these physicians stated that he had voted to deny petitioner's application for membership on the hospital staff.

The evidence showed that in administering multiple injections, petitioner customarily gives two shots simultaneously, employing one or both hands. One D. R. Dazey, a member of the fire department of the city of Delray Beach, testified that he was brought to petitioner's office after becoming ill at the fire sta-

tion. There, Dazey having dropped his trousers, Dr. Weir asked the fireman's companion, "Have you ever seen *Two-gun Weir* operate?" and gave Dazey two shots simultaneously in the posterior, following which the patient "passed out;" Dazey stated that he was "satisfied" with the treatment. The great weight of the medical testimony strongly condemns the practice of administering two injections simultaneously.

A woman 39 years of age, mother of five children, testified that she was employed in Dr. Weir's office for a period of some weeks; that he invited her to his home for a social visit during which, in Mrs. Weir's absence, petitioner made amorous advances and actively undertook to perform an unnatural sexual act. She stated that petitioner would get in a state of "panic and confusion" with his patients; that she once found petitioner in his office, exposed, "manipulating" himself; that he would kiss her and once opened his fly, "pulled out his penis, and suggested the examining table," but she never observed him making improper advances to patients. He told her that he "was in this business for money." This witness, who said she felt Dr. Weir had a "problem," herself had a temporary nervous breakdown about 15 years ago, accompanied by illusions.

A girl 17 years of age testified that while she was a patient of petitioner's in February, 1962, undergoing treatment for gonorrhea, petitioner embraced her and kissed her; that he offered her an alcoholic drink and asked her if she had a "dress up" dress, and when she replied in the affirmative, he said, "Would you like to go out for cocktails or to dinner or something?" Petitioner denied the truth of this testimony and that of the previous witness, and petitioner's wife testified that the previous witness had never been in the Weir home.

A former patient testified that she underwent a physical examination by petitioner in November, 1960, completely nude, in which he checked her breasts in a manner which she regarded as offensive and said, "Imagine getting paid for this." Her testimony as to that remark and being wholly nude was contradicted by an office nurse.

While the testimony regarding the petitioner's moral and professional qualifications is not conclusive or undisputed, the evidence raises questions regarding the same which in the opinion of the court are sufficient to preclude a finding that the respondent hospital district and its commissioners abused their discretion or acted unlawfully, arbitrarily or capriciously.

It is therefore ordered and adjudged that the petitioner be and he is hereby denied a peremptory writ of mandamus; that the

alternative writ previously issued herein is discharged, and that this cause be and the same is hereby dismissed at petitioner's costs.